There are two issues on appeal, and I would like to address the issue on the suppression hearing to begin with and to save some time for rebuttal. The issue on appeal and suppression issue has to do with the question whether a case, U.S. v. Conway, which holds that it is permissible for corruption officers or other law enforcement to enter an apartment of a probationer based upon a reasonable suspicion that illegal activity is occurring, can and should be expanded to a case of U.S. v. Conway. This situation arose because Mr. Andrade, who as it turned out was in fact Mr. Sanchez's roommate, was on probation, had given the address as his address, but the probation officer, the DOC officer, did not believe that he lived there. They went to the address. She took him along with police officers to determine whether he in fact did live there. They entered the apartment because she did not believe he lived there. Well, it seems to me that that's kind of a specious argument in that they did not really know where the guy lived. He said he lived at this place. Wouldn't that be the first thing to verify whether he did or not? Yes. But verifying whether someone lives in an address when you suspect they do not by violating someone else's rights is not appropriate. Mr. Andrade could have picked out any house and said I live there or I live there. That would certainly not give probation officers along with the police the right to enter any house when in fact it is their belief that he does not live there. Well, they did find out that a person who looked like him was living there under a different name. And they still believed that he did not live there. The probation officer testified at the suppression hearing when asked why she entered the apartment and whether she believed that he lived there. She said she had very serious doubts that he lived there. If I were the supervisor of that probation officer and the officer said, well, I didn't go there because I don't think he lives there even though he says he does and the landlord thinks he does, what would you say to that probation officer? You're just right not to go and look. There are things that can be done far short of simply forgetting it and going home, if I can paraphrase what you're saying, and violating other people's Fourth Amendment rights. When they went to the apartment, there were in fact three other people in the apartment. They could have knocked on the door and asked permission from the people in the apartment whether it was okay. They could have done an investigation like they did in Conway. In Conway, they spent some time investigating where in fact the defendant lived. They had information from neighbors who had seen him on numerous occasions walking his dog. They had information from the defendant himself who said you can't go to that house, my dog will bite you. Can you explain to me why, you seem to be arguing it somewhat cross purposes, what was the reasonable suspicion that he didn't live there after they twice asked the landlord and she said he did live there? She said that someone who looked like him had signed the lease. No, no, but then she saw him, physically saw him and said, oh yeah, that's Ove Guzman, he lives here. It's the probation officer who still testified that she doubted that he lived there even after having that information. Now, why she doubted that? I guess what I'm trying to find out is why aren't you arguing that there was no reasonable reason to think that he didn't live there after the landlord looked at him, the guy, and said, yes, he lives here? The reason I'm arguing there was no reasonable suspicion is because that's what the probation officer stated in testimony during the suppression hearing, that she did not believe that he lived there. And if the probation officer did not believe she lived there, the fact is based upon the probation officer's testimony. This was not an entry into the apartment to verify he lived there, as was the case in Conway, where the defendant opened the door with the key and the officer went in with him. This was a case that the probation officer and the police entered the apartment essentially to verify that he did not live there. And that is based on what the probation officer testified to at the time of the suppression hearing. She stated, I had suspicions that he did not live there. So it's not a question. That suspicion that he didn't live there was supposedly originally generated by the fact that although he gave his address as living there, that he didn't give the apartment number. Is there anything in the record about anybody, whenever anybody ever asked him to give the apartment number? I'm sorry. Did anybody ever ask Mr. Andrade what apartment he lived in? I don't remember that specifically, but if I'm recalling, the probation officer said that he told her he didn't know the apartment number. This was a multi apartment complex building. Yes, I believe it was either. And I'm not sure that it's in the record that it's a three or four story apartment building. And so by giving his address just as a street address wouldn't indicate which apartment he lived in, would not indicate which apartment he lived in. And based upon. Yes, he lives there. I don't believe it. Under the government's theory and perhaps somewhat under the court's theory, probation officer and the police could have entered any of those apartments to establish the fact that he did not live there. And that is the critical difference here. It's not whether or not they had suspicion that illegal activity was going on by a probationer. They didn't enter any apartment. They went to the apartment number that he said or that the apartment manager said he lived in. They didn't enter any apartment. They went to that specific apartment. They did not enter any apartment. They entered an apartment that they believed, based upon their own testimony, that they believed that he did not live in. To confirm whether or not he did live there. Essentially to confirm that he did not live there. If there had been. The indications that there were in Conway. And that they believed he lived there when he was saying he didn't. We might be in a different situation. But the fact is, he said he lived there and they believed that he did not. And if searches are going to be or entry into the apartment. Because I think that it's entry into the apartment that is the first question. That is the initial breach of constitutional rights of Mr. Sanchez and others in that apartment. And there are all kinds of things that can be done other than simply walking away from it. As I said, they could have knocked on the door. They could have waited until someone else came to the apartment. They could have done any number of things rather than essentially break in to the apartment. All of the other things that occurred. They went to the bedroom and saw indicia of drug activity. And ultimately got a warrant. All of that was based upon the initial entry into the apartment that was in violation of Mr. Sanchez's rights. Unless there are other questions, I would like to reserve the rest of my time for rebuttal. Fine. Your Honor, may it please the court, counsel. My name is Stephanie Lister. I'm an assistant U.S. attorney for the Eastern District of Washington. This case involves two issues. The first is whether or not the district court properly found that a probationary search based upon reasonable cause to believe a probationer had violated his conditions of supervision was not in violation of the Fourth Amendment based upon reasonable suspicion. Second issue is with respect to the district court's finding that the motion to dismiss was without merit and that there was not prosecutorial misconduct in this case. I'd like to first address the motion to suppress and the facts in this case. And I will address the misconduct issue because it is raised again in the reply brief of the defendant. With respect to the motion to suppress, I think what's most important is an actual, factual understanding of the case. In this particular instance, the suppression hearing established that the defendant that the probationee had given a street address for an apartment complex, but he did not give a number. Clearly at the excerpt of Record 58. He was not asked, Your Honor. I've reviewed the transcript. I find no indication that he was asked. However, there is an indication on page 59 of the excerpt of the record that he was searched for a key to the apartment. They did not find a key. He was also searched to determine if there were any paperwork on this person which related back to a specific apartment. They did not find that. Then during the suppression hearing, the Department of Corrections officers testified that their purpose in going to this location was to verify the address and to establish dominion and control. You'll find that at excerpt of Record 62. Now, before they searched him for the key and so on, they had gone to the landlord with this picture, and she said that's Mr. Guzman, which is not his name, and he lives here. Absolutely, Your Honor. A week prior, they had gone to the landlord. She identifies the photo. Also, the day of the search, when they take the probationee and ready to the apartment complex, they locate the landlord. She again identifies the probationer. Why did they have a reason to believe that he didn't live there? Absolutely. There's a nexus. Absolutely. So they had no reason to think he didn't live there? Absolutely. And I find no reference in the transcript that indicates, as defense counsels, that they had serious doubts. But how could they go in and search? Pardon me? So how could they go in and search? They had no reason to think he didn't live there. Well, that's not what they said. The Department of Corrections officers testified that they thought that he lived there based upon the identification made by the landlord of the photograph. Right. The person in the photograph. Why were they going in the apartment? To verify that he actually lived there. But how does that comport with the Washington statute? The Washington statute says if they have a reasonable cause to believe it's in violation of the conditions, they can go search. Okay. One of the conditions is that the probationee provides an address so they can locate him, so they can supervise him. So after they know that he does live there, they can still go in to see whether he doesn't live there. They need to confirm that. They don't need to rely on a landlord to tell them that she thinks this is a person that's rented apartment 170. They have a right to go in. Frankly, if the probation officer had said, look, he was living there under an assumed name, and that's suspicious, and that's why we're going in there, that would be one thing. And they did. No, they didn't. At Exhibit Record 63, the Department of Corrections officers believed that he was being deceptive regarding his name. Right. But that's not a violation. They have never identified that as a violation of his probation conditions, giving a false name. Giving a false name and not providing an address, they thought he was being deceptive. I mean, he's used that false address to rent an apartment. He's being deceptive about where he's living. That's a violation of his conditions of probation. Aren't you really arguing that the violation of his probation was that he gave an inadequate address because he did not give the apartment number? Correct, Your Honor. Therefore, even though the apartment manager identified him as a person that lived there, they still had a right to go in there because of the probation violation of not giving a correct and full address as to where he lived. Correct, Your Honor. And that's what the district court found. In fact, the district court believed that the Department of Corrections perhaps even had a duty to confirm that information. The district court applied Conway. The district court judge in this case was Judge Van Sickle. Judge Van Sickle is the same judge who decided Conway. I submit to you that he was well aware of the facts in Conway, well aware of the laws that applied to Conway. Conway, they searched the place they thought he did live, not the place he didn't live, right? Yes, Your Honor. But based on reason to believe that he violated his conditions of release. The government believes there was a reasonable cause based upon well-founded suspicion that he violated his conditions. Tell me again what the well-founded suspicion is. He gave an address which didn't have an apartment number. Lots of people who give addresses of apartment houses don't give the apartment number unless somebody asks them. Nobody asked him. And you say nobody asked him, right? There's no reference to that in the record, yes, Your Honor. For all we know, if they had said which apartment, he would have said which apartment. He wrote down his address. That's a strange way to evade somebody when you've given them the correct address of where you live. And then they go in and they ask the landlord, does this person live there? And she says yes. And then they bring the guy in and say, does this person live there? And she says yes. And they still have reason to believe that he doesn't live there. Why? Because he doesn't provide a number to this complex, the apartment number, that this was 170. This is a big complex. He never gives a number. And he rents this apartment under an alias. Alias is disturbing of something. I don't know about the fact that he doesn't live there, but of the fact that he's doing something, for some reason he doesn't want people to be able to find him. But not the probation people, apparently, because he told them where he was. Your Honor, I disagree. He told the probation officers, he gave them a street address for a large apartment complex. He did not give them an address. And when he rented that apartment, he used an alias name. And so the Department of Corrections officers testified they believed he was being deceptive about his address and deceptive about his name. And that's what the record supports. They searched him for a key, didn't find the key, didn't find papers. Obviously, they wanted to know what the apartment number was. By the regulations, was he supposed to give that complete address in writing? Absolutely, Your Honor. And he failed to do that. He had never done that? No. But your position is that the violation occurred right then? Yes. And there was further investigation because they went to the address that he gave, and they found out it was an apartment complex. Giving the apartment number verbally would not comply with the regulations? He didn't even do that that we find. Well, put another way, the apartment manager saying that he lived in this apartment, that wouldn't comply with the regulations? No, Your Honor. Your Honor, the government contends that the district court did properly apply Conway in this case. I would also like to address the second issue, which is with respect to prosecutorial misconduct. This was raised by the defendant again in the reply brief. There were a number of issues that the defense complained about. I'd like to discuss just a few. The first is with respect to the polygraph, and the defendant indicates that the court and the counsel was misled with respect to the polygraph example. The second issue is with respect to the defendant's testimony. Your Honor, this was a situation in which the government requested a polygraph of a co-defendant to determine whether or not, in fact, he was providing truthful information about the defendant, Sanchez. This was a tool that the government was using to verify whether or not this individual was being truthful. He took the polygraph. The polygraph results indicated that he had not been deceptive. Now, the defendant complains that the AUSA, when he represented what the results of the polygraph were, didn't like the way that was presented. But in this particular case, I think what's important is that all the polygraph information was provided to defense counsel way in advance of trial. They had an opportunity to review that material. More importantly, the polygraph information was never used at trial. Your Honor, I think this case is significantly different from this court's decision in Bluford because in Bluford, the court found that there was prosecutorial misconduct because the government hadn't turned over tapes. In this case, we had, and we made no references to the polygraph. There's also a second allegation with respect to coercion of plea. Your Honor, that is without merit because in this particular case, no plea was ever coerced. The defendant never attempted to enter a plea. He never pled. He invoked his right to go to a trial, and a jury convicted him. Thus, his due process rights were not violated. The last issue I'd like to discuss is with respect to the witness statements. And the defendant alleges that there was an interference with witnesses. Your Honors, in this case, the witnesses provided contradictory information. Why, we cannot say for sure. We know that these were young men, approximately 21 years old, who were childhood friends of this particular defendant. We know that Andretti changed his plea, and all of a sudden, the statements changed to implicate Andretti instead of Sanchez. What's important is that there is no evidence that the government ever interfered with these witnesses' ability to testify at trial. Not like the case of Lord, where the government refused to provide use immunity until these witnesses were not able to testify for the defense with respect to entrapment. That's not the case. These witnesses testified at trial, and they never invoked the Fifth, and they never refused to answer questions. This case is not like the Morrison case, where the government interviewed a witness, told her she could be possibly charged with several violations, including perjury. When she testified, she refused to answer over 30 questions and invoked the Fifth. Not the situation here. Your Honor. One thing I did wonder is what is the difference between threatening somebody with prosecution and telling them that if they testify falsely, they could be prosecuted for perjury? Well, Your Honor, the case law clearly supports that the government should advise a witness if they – with respect to perjury and the consequences of perjury. I think then the threatening depends upon the context of the situation. And then most importantly, we have to determine did that cause substantial interference with that witness' ability to testify, and there's no evidence of that in this case. At the end of the day, this Court has to determine whether or not the prosecutor's conduct was so outrageous and so grossly shocking that it violated our sense of universal justice. I don't believe that is the case in this situation. This prosecutor was seeking justice, and he was searching for the truth. That's why he requested the polygraph examination. He wanted to know if Andretti was providing truthful information against the defendant.  That's why when he interviewed these witnesses and he believed they were lying and the record supports that they admitted they were lying, he advised them of the consequences of perjury. He told them repeatedly to tell the truth, not to exaggerate. He was seeking justice and searching for the truth. His conduct in this case was not – did not constitute prosecutorial misconduct. And thus, Your Honor, we respectfully request that you affirm the decision of the prosecution on prosecutorial misconduct. I have nothing further unless the Court has any questions. I've got very little time. I'm going to talk very rapidly. Okay. Your Honors, with respect to the entry into the apartment, the government's trying to have it both ways. Either they believed he lived there, in which case there was no need to enter the apartment, or they believed he did not live there, in which case there was no right to enter the apartment. Well, what about Judge Hamilton's inquiry? That is, they believe that he violated a regulation with respect to where he lived by inadequately disclosing his – the entirety of his address and living there under a false name. Does it matter at that point what their subjective belief was of where – whether he lived there or didn't live there? Yes, because it's their subjective belief that is the basis for determining that they have the right to enter an apartment without consent or without a warrant or without anything else. It is that subjective belief. In Conway, there was the subjective belief. And the question is – then becomes, is the subjective belief reasonable? But in this case, based upon what they said the subjective belief was, it doesn't matter whether it was reasonable or not, because their subjective belief did not have the basis to give them the right to enter the apartment. And someone asked about, or the statement was made, probation officers have a duty. They do have a duty to investigate. They do have a duty to be sure that probationers are living where they say and doing what they're supposed to do. But they also have a duty to the rest of us not to violate our rights, and that's what happened here. I was going to address the motion to dismiss, but I see my time is up. I'll rely on the brief. Thank you very much. The case of United States v. Sanchez is submitted. We will go to United States v. Pratt and Chaffin.
judges: B. Fletcher, Hamilton, Berzon